UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

BROOKE ELIZABETH HEIKE and
BETHANY L. BROWN,

                Plaintiffs,

                                          Case Number 10-11373-BC

v.                                      Honorable Thomas L. Ludington

CENTRAL MICHIGAN UNIVERSITY
BOARD OF TRUSTEES and CENTRAL
MICHIGAN UNIVERSITY,

                Defendants.

_____ /

**OPINION AND ORDER CONSTRUING DEFENDANTS' MOTION TO DISMISS AS A
MOTION FOR JUDGMENT ON THE PLEADINGS, CANCELING HEARING,
GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS,
DISMISSING PLAINTIFFS' MOTION TO STAY PROCEEDINGS AS MOOT AND
DISMISSING PLAINTIFF HEIKE'S CLAIMS**

On April 7, 2010, Plaintiffs Brooke Heike ("Heike") and Beth Brown ("Brown")
(collectively, "Plaintiffs"), filed a complaint against Defendants Central Michigan University Board
of Trustees (the "Board of Trustees") and Central Michigan University ("CMU") (collectively,
"Defendants") in the United States District Court for the Eastern District of Michigan which was
assigned to the Honorable Denise Page Hood. Plaintiffs' complaint alleges claims under Title VI
of the 1964 Civil Rights Act, Title IV of the Educational Amendments Act of 1972, and the Equal
Protection Clause of the Fourteenth Amendment.  Plaintiffs allege they were discriminated against
based on their race and sexual preference when their athletic scholarships were not renewed. Judge
Hood issued an order for Plaintiffs to show cause why the case should not be dismissed for failure
to prosecute on August 17, 2010 because the filing fee had not been paid and service of process had

not been made on the Board of Trustees and CMU.[1] Summons were issued on September 1, 2010, and Defendants filed an answer to the complaint with affirmative defenses on September 23, 2010 [Dkt. #12]. An amended answer was filed on October 13, 2010 [Dkt. #14]. On October 22, 2010, Defendants filed a motion to reassign the case [Dkt. #15] to this Court as a companion case. An order was entered reassigning the case to the Northern Division on November 8, 2010 [Dkt. #17].

Now before the Court is Defendants' motion to dismiss Plaintiff Heike's claims [Dkt. #18] pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants generally allege that claim and issue preclusion bar Heike's claims. Because Defendants' motion to dismiss was filed after their responsive pleadings were filed, the motion should be addressed as one for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) or as one for summary judgment pursuant to Rule 56 rather than as one for dismissal pursuant to Rule 12(b)(6). In the instant case, the matters referenced in the parties' briefs that are outside of the pleadings are matters of public record, and construing the motion as one for judgment on the pleadings under Rule 12(c) is appropriate.

Heike filed an untimely response to Defendants' motion on April 13, 2011 [Dkt. #24]. In her response, Heike alleges that res judicata and collateral estoppel are inapplicable because the parties to the instant action are not the same as in *Heike v. Guevara, et al.*, Case Number 09-10427, ("*Heike I*") and the causes of action and necessary proofs of the instant case are different. Defendants filed a reply [Dkt. #24] on April 18, 2011.

The Court has reviewed the parties' submissions and finds that the facts and the law have

---

[1]Defendants contend that the only proper defendant to this case is Central Michigan University Board of Trustees and Defendants' papers reference a single defendant. However, Defendant Central Michigan University has not yet been dismissed from the suit.

been sufficiently set forth in the motion papers.  The Court concludes that oral argument will not aid in the disposition of the motion.  Accordingly, it is **ORDERED** that the motion be decided on the papers submitted.  E.D. Mich. LR 7.1(e)(2).  For the reasons provided below, the Court will grant Defendants' motion for judgment on the pleadings.

## I.    Facts[2]

### A.    The Plaintiffs

Plaintiff Brooke Heike is a female individual of Caucasian and Native American descent. Heike attended Romeo High School in Romeo, Michigan, from September 2002 through June 2006. While attending Romeo High School, Heike played on the girls' basketball team.  The team had a record of one win and seventeen losses Heike's freshman year, yet the team won the league championship Heike's senior year.  Heike won a "Most Valuable Player" ("MVP") award and was co-captain of the team her senior year.  Heike was also named MVP of the Mid-American Conference ("MAC") Blue All-League Team, member of the first tier MAC All-Conference team, member of the first tier All Metro East team, member of the second tier All Metro East team, and received honorable mention on the All-State team.  Several colleges and universities recruited Heike to join their women's basketball programs and offered her athletic scholarships, including CMU and several other National Collegiate Athletic Associations ("NCAA") Division I schools.

Heike generally alleges that CMU and its representatives promised Heike that if she enrolled at CMU and joined its women's basketball team, she would receive a college education at CMU and that an athletic scholarship would pay for tuition, room and board, and other expenses during the four years that it would take Heike to earn her degree at CMU. Specifically, Heike alleges that

---

[2]The Facts are taken from Plaintiffs' complaint, which references Exhibits as sources for the factual allegations.  Plaintiffs did not, however, include any exhibits with their complaint.

then-CMU Head Coach Eileen Kleinfelter stated to Heike during recruitment, "I can't guarantee how much playing time you'll receive, but I can guarantee you an education." Heike alleges that she accepted CMU's offer and declined other offers based on these representations.

On November 3, 2005, then-Athletics Director Herb Deromedi sent Heike a letter, offering her an "athletic grant for the 2006-07 academic year," covering in-state tuition/fees, room and board, and a book loan. The letter stated that renewal of the athletic grant for subsequent years was "subject to the conditions listed on the MAC and National Letters of Intent," which Heike was required to sign. Heike signed the related letters of intent.

Plaintiff Bethany Brown is a female individual of Caucasian descent. Brown attended Grand Ledge High School, in Grand Ledge, Michigan, from September 2003 through June 2007. While attending high school, Brown played on the girls' basketball team. Brown won Class A All-State Honorable Mention during both her junior and senior years, Class A All-Area by the *Lansing State Journal* and First Team All Conference during her junior and senior years, and was voted "Most Valuable Player" and team captain for both her junior and senior years. Several colleges and universities recruited Brown to join their women's basketball programs and offered her athletic scholarships, including CMU, Northern Illinois, Niagara, Lehigh, Akron (Ohio), and Saginaw Valley State University.

Brown generally contends that CMU and its representatives promised Brown that if she enrolled at CMU and joined its women's basketball team, she would receive a college education at CMU and that an athletic scholarship would pay for tuition, room and board, and other expenses during the four years that it would take Brown to earn her degree at CMU. Specifically, Brown alleges that she inquired what would happen if then-CMU Head Coach Eileen Kleinfelter realized

-4-

Brown was not as talented as expected. Brown alleges that Coach Kleinfelter stated in response, "That will be my problem but your scholarship is safe." One July 17, 2006, then-Coach Kleinfelter send Brown an email stating "We are offering you a full ride scholarship and now that you have given us a verbal commitment, our word is good as gold."

On November 6, 2006, then-Athletics Director Dave Heeke ("AD Heeke") sent Brown correspondence offering her an "athletic grant" covering in-state tuition, fees, room, board and book loan.) AD Heeke's letter states that renewal of the athletic grant (hereinafter referred to as "scholarship") for subsequent years was "subject to the conditions listed on the MAC and National Letters of Intent." Brown alleges that CMU, through its authorized representatives, made representations to Brown before and after November 2, 2006 that she would receive the "athletic grant" for all four years of her education. Brown alleges that, based on these representations, she declined other offers she received and accepted the offer from CMU. Brown signed the MAC and National Letters of Intent which AD Heeke had included with his November 2, 2006 letter.

### B.   Plaintiffs' Experience at CMU

Heike matriculated at Central Michigan University in September 2006 and was a member of the women's basketball team for the 2006-07 and 2007-08 seasons. In the 2005-06 season under Coach Kleinfelter, the CMU women's basketball team had won sixteen games and lost twelve games. In April 2007, at the close of the 2006-07 season, CMU announced that Coach Guevara would replace Coach Kleinfelter. Coach Guevara had previously been the head coach of the women's basketball team at the University of Michigan and an assistant coach at Auburn University. Subsequently, during the 2007-08 season, the team won six games and lost twenty-three games.

In April 2007, before Coach Guevara had witnessed Heike practice, Heike alleges that she

met with Coach Guevara, who told Heike that she did not want Heike to wear make-up.  In May 2007, Brown alleges that she met with Coach Guevara, who told Brown that she "wasn't that big" and that she looked pretty. Despite the alleged discriminatory and harassing actions taken against them that will be further discussed below, Plaintiffs allege that they continued to work hard and were never told that their skills or abilities were lacking.

Plaintiffs allege that Coach Guevara subjected them to unwelcome harassment and discipline throughout the 2007-08 season, including by repeatedly telling Plaintiffs that they were not her "type" of person.  Plaintiffs allege that Coach Guevara's comments led them to believe that they were not Coach Guevara's  "type" of person because Plaintiffs identified as heterosexual and wore make-up. Plaintiffs believed that Coach Guevara found this to be "an unacceptable heterosexual behavior."  Plaintiffs allege that Coach Guevara repeatedly attempted to force them to transfer to another college or university. This included Coach Guevara allegedly directing Assistant Coach Bill Ferrara to tell Heike that she should transfer to Saginaw Valley State University.

Plaintiffs allege that Coach Guevara stated to them, in front of other players and assistant coaches, "Your only role on this team is to keep the grade point average up and challenge the players that will play in games."  Plaintiffs alleges that at a practice on December 14, 2007, Coach Guevara stated to Heike, in front of the entire team, "Just because you never play doesn't mean you don't have to work hard."  After Heike responded, "I work hard all the time and never get to play?  Why wouldn't I work hard now?" Coach Guevara then kicked Heike out of practice.  Heike was upset and could not eat and vomited profusely.  Heike was examined by a medical doctor, who instructed by note that Heike not attend practice on December 15, 2007, because of her illness.  Despite receiving the doctor's note as to Heike's illness, Coach Guevara told the assistant coaches and team members

-6-

that she had kicked Heike out of practice for another day.  Immediately following this incident, Heike requested additional assistance with her work-outs and training.  Heike alleges that she never received additional assistance, but such assistance was provided to the other players whom Coach Guevara retained on the team.

Brown alleges she was similarly subjected to wrongful treatment and harassment by Coach Guevara and the assistant coaches, including comments that she wore her pants too tight, that she wore too much make-up, that she did not need to style her hair, and that she was too "girly-girl." Coach Guevara also allegedly made insulting and demeaning comments regarding Brown in front of other coaches and players, including a comment that "every once in a while, even a blind quirrel finds a nut" after Brown completed a successful practice.  Brown alleges that she was not assigned to have weekly meetings with an assistant coach to discuss improving her playing skills, but was instead assigned to have weekly meetings with Ethan Gelfand, a video coordinator for CMU.

On December 19, 2007, Heike was advised by her doctor that her medical conditions were triggered by significant emotional stress.  Despite this, Heike continued to work hard.  Prior to a tournament at Northwestern University, Assistant Coach Ferrara advised Heike that she was going to be considered as a possible starter player or the first player off the bench; Heike was selected as the first player off the bench.  After the tournament, on the bus ride back to CMU, Heike told Coach Guevara that she wanted to watch the film of the game because it was the longest time that she had been able to play in a game.  Coach Guevara directed Heike to Assistant Coach Kathy McGee, with whom Heike made an appointment to view the film of the game.  However, Assistant Coach McGee did not arrive at the appointed time, and Heike never viewed the film.

During the 2007-08 women's basketball season, CMU won only six games and lost twenty

three.  Plaintiffs allege that Coach Guevara did not provide them with any notice in writing as to their alleged performance deficiencies or that either Plaintiff did not meet the team's expectations. Coach Guevara also did not implement a program to assist either Heike or Brown with their alleged deficiencies nor did she communicate that either Plaintiffs' scholarship retention was in jeopardy.

On March 13, 2008, Heike alleges that Coach Guevara told Heike that she was not her "type," that she was eliminating Heike from the team, and that Heike would be losing her athletic scholarship.  Heike alleges that Coach Guevara did not provide Heike with any additional reasons for eliminating her from the team.  Later, Coach Guevara told the team that Heike had been removed from the team because Heike was "unhappy," and not because of any deficiency on the part of Heike or anything related to Heike's ability or capacity to improve her skills.

Brown alleges that she was also called into Coach Guevara's office on March 13, 2008 and told that her athletic scholarship would not be renewed because she was not Coach Guevara's "type." Brown similarly alleges that Coach Guevara did not provide Brown with any additional reasons for not renewing her scholarship. Instead, Coach Guevara told Brown that she was a team leader through her positive attitude, effort, work ethic and her commitment to team goals. Coach Guevara likewise told the women's basketball team that Brown was "unhappy," and that Brown had decided not to come back to play for CMU. Coach Guevara did not disclose to Brown or the team that Brown's scholarship had been taken away because of any deficiency on Brown's part or anything related to her ability to improve her skills.

Despite Heike being a member of the women's basketball team for two full seasons and Brown being a member of the women's basketball team for one full season, Coach Guevara refused to allow Plaintiffs to attend the concluding banquet held at the end of the 2007-08 season.  Plaintiffs

-8-

allege that this caused them further embarrassment.

Plaintiffs allege that they were treated differently by CMU than other athletes of a different race and gender, particularly student-athletes on its male basketball team. Marcus Van, for example, who is an African-American male, and who was not dismissed from the CMU men's basketball team nor was his scholarship revoked even though he violated CMU's rules and pled guilty to a criminal charge of conspiracy to steal and unlawful use of a credit card.

On March 18, 2008, in a meeting in her office with Brown and Brown's father, Mike Brown, CMU Associate Athletics Director Marcy Weston advised Brown and her father that, "We have agonized over this and what we're doing may not be right but we have decided to let the coach do this one time." On March 27, 2008, Patricia Pickler ("Pickler"), the Assistant Director of the Office of Scholarships and Financial Aid, sent Heike a letter advising that her athletic scholarship and financial aid would not be renewed for the 2008-09 academic year, based on the recommendation of the Athletics Department.  Brown received a similar letter from Pickler that same day.

On March 31, 2008, Brown's father wrote to Pickler by email, which was copied to Coach Guevara and Director of Athletics Heeke, stating:

> In your letter to Bethany dated March 27, 2008 you referenced the non-renewal as being "in accordance with the NCAA constitution, and the conference and institutional regulations that apply."  Will you please provide copies of the "NCAA Constitution, and the conference and institutional regulations that apply" as you referred to in your letter. If you cannot send copies please provide me with the applicable sections.

A series of emails ensued between Mr. Brown, Pickler, and Senior Associate Athletics Direct Derek Van Der Merwe ("Van Der Merwe") regarding the NCAA manual, the conference and institutional regulations that applied, and the policies in CMU's Student Athletics Handbook. Mr. Brown requested further clarification for the decision to revoke Brown's financial aid and an explanation

of the expectations, if any, Coach Guevara had of his daughter's performance. Mr. Brown also asked

Van Der Merwe to provide the date or dates that Brown was notified that her performance was not

meeting Coach Guevara's expectations as well as any improvement plan to help Brown master skills

or address deficiencies.  Brown alleges that neither she nor her father received any of the requested

information.

On April 7, 2008, Heike submitted a written request for a hearing and set forth the reasons

why she believed CMU had unfairly deprived her of her scholarship and education.  In essence,

Heike's letter contends that Coach Guevara wanted Heike to quit the team because Heike was not

her "type," that Coach Guevara "should have to go through the normal process and time period to

build the 'type' of team she wants," and that Heike's abilities and efforts were not deficient as

compared to the other players on the team. On April 9, 2008, Brown also submitted a written request

for a hearing and set forth the reasons why she believed CMU had unfairly deprived her of her

scholarship and education.

On June 5, 2008, Pickler advised Heike and Coach Guevara in writing that an appeal hearing

was scheduled for June 11, 2008.  Pickler's letter advised that:

> The purpose of this appeal hearing is to determine if the action to not renew Ms. Heike's
> athletics aid for the 2008-2009 academic year was a substantial injustice.  If the
> committee decides that it was more likely than not that Coach Guevara's decision was
> reasonable, it will uphold the decision.  If it decides that it was more likely than not that
> her decision was unreasonable, it will ask that Ms. Heike's athletics aid be reinstated.

An attachment to the letter described certain procedures that would be followed at the hearing.  In

particular, the procedures provided that Heike would be able to make a closing statement and to ask

questions of Coach Guevara and witnesses. Heike alleges that the correspondence did not indicate

why the issue was described as whether she was subjected to a "substantial injustice" or from what

-10-

source this standard was derived. Heike also alleges she was not informed as to what constituted a "reasonable" or "unreasonable" decision.

Another attachment to the letter was entitled "Brooke Heike Statement, prepared by Sue Guevara, April 24, 2008."  In this statement, Coach Guevara stated that Heike "consistently struggle[d] to understand key basketball concepts. This was reinforced by the secondary role she played in all basketball practice activities." Coach Guevara further wrote, "What is most disconcerting is that Brooke never appeared to strike for success," that "[e]ven though Brooke was failing to meet these expectations, she did not seek additional help or assistance," and "[s]he appeared to be very satisfied with her deficiencies."

In comparison, Coach Guevara wrote, "[a] number of those members of the team who were underachieving throughout the year demanded additional time from coaches to help them with the process of improvement.  These individuals continue to be members of the team."  Coach Guevara further wrote that Heike was "kicked out of practice" on both December 14 and 15, 2007, "for lack of effort, poor body language, and bad attitude overall . . . this stemmed from her consistently missing sprint times and not grasping basic concepts essential to the completion of conditioning drills."

Heike alleges that she was never provided with any written explanation of her alleged deficiencies, that she was never told by Coach Guevara why she did not meet the expectations of players on the team, and that Coach Guevara never implemented a program to assist her with her alleged deficiencies.  Heike further alleges that Coach Guevara never told Heike that her athletic grant was in jeopardy. Coach Guevara also did not explain that the reasons that Heike's scholarship was not renewed was because she did not meet the conditions listed on the MAC and National

Letters of Intent.

On June 11, 2008, Heike appeared before the appeals committee at the CMU Office of Scholarship and Financial Aid for a hearing, which took approximately two hours. The appeals committee members were Pickler; Kevin Love, a CMU professor of management; and Julia Sherlock, CMU Director of Career Services. Prior to the hearing, Heike alleges that she asked some of her team members to appear as witnesses on her behalf, but Heike was told by them that Coach Guevara had instructed them that they were not allowed to testify on Heike's behalf. Heike alleges that Pickler did not permit Heike to make an opening statement or to question witnesses, that Pickler argued on behalf of Coach Guevara, that Pickler rejected Heike's evidence as not relevant, that Pickler tried to intimidate Heike through verbal abuse directed at Heike's father, and that Pickler repeatedly interrupted Heike when she asked questions.

In the complaint, Heike highlights the following aspects of the hearing, which Heike asserts conflict with Coach Guevara's written statement dated April 24, 2008: that Coach Guevara confirmed that she had not provided Heike with any written explanation of her alleged deficiencies, that Coach Guevara had not implemented a program to assist Heike with her alleged deficiencies, that Heike had come to Coach Guevara's office to ask for assistance, and that other players had missed sprints or had been asked to leave practice, yet retained their scholarships. Coach Guevara affirmed that she had never taken away a player's athletic scholarship before, but that players on teams she had previously coached had transferred to other schools after she advised them that they would not receive playing time. Coach Guevara could not provide examples of Heike's deficiencies.

Heike alleges that she provided statistics from the 2007-08 season to the appeals committee, which Heike contends demonstrated that other retained players did not produce results, but received

-12-

greater playing time than Heike . Assistant Coach Bill Ferrara testified that the entire team needed to improve, that Heike was frustrated with being singled out for disparate treatment, and that Heike's skills improved over the season. Brown also testified at the hearing, stating that she too received a statement written by Coach Guevara only after she requested an appeal of the revocation of her scholarship. Brown alleges that her letter was nearly identical to Heike's but also advised Brown that she was a "joy to have on the team" and could remain a player on the team without a scholarship. Brown testified that neither she nor Heike received any individualized assistance to remedy any deficiencies and that they were not warned that their scholarships were in jeopardy. Heike alleges that she "made clear to the Appeals Committee that she believed she was being singled out for disparate, discriminatory treatment and abusive wrongful sexual harassment because of her race and color and because of her heterosexuality, and that she has suffered because of defendants' wrongful treatment of her."

Heike alleges that the Appeals Committee did not consider whether Heike had suffered a substantial injustice or whether Coach Guevara's decision was reasonable but instead "rubber-stamped" the decision to not renew Heike's athletic scholarship and dismiss her from the team. Brown alleges that her appeal was not adequately considered but was similarly "rubber-stamped." Plaintiffs allege that in doing so, CMU treated them differently than other similarly-situated student athletes with equivalent or less satisfactory athletic performance who were treated more favorably because of their race or color. More specifically, a member of the men's basketball team, Marcus Van, was dismissed from the men's team for unspecified circumstances but reinstated soon thereafter despite violating the CMU Student-Athlete Handbook and NCAA Letter of Intent. Van's scholarship was not revoked.

Finally, Plaintiffs allege that neither AD Heeke, who began his employment as CMU's Athletic Director on January 16, 2006, nor CMU investigated the reasons for Coach Guevara's firing by the University of Michigan in 2003 or whether Coach Guevara had forced players who were not her "type" to leave the team at that school and had poor interpersonal relationships with her players. Six players left the University of Michigan's women's basketball team during the seven seasons that Coach Guevara coached the team.  Plaintiffs allege that those players have stated that poor communication on the part of Coach Guevara or Coach Guevara's invasions into their personal lives were the reasons for their leaving.

### C.   Procedural History of *Heike v. Guevara, et al.*

The factual allegations in *Heike I* pertaining to Plaintiff Heike are nearly identical to those set forth in her immediate complaint. Heike's complaint in *Heike I* alleged the following claims: (1) violations by all Defendants of procedural and substantive due process pursuant to the Fourteenth Amendment to the U.S. Constitution, based on alleged flaws in the process used to determine that Heike's athletic scholarship should not be renewed for the following year; (2) violations of the Equal Protection Clause to the U.S. Constitution by all Defendants based on allegations that the decision was made to not renew Heike's athletic scholarship because of her gender and status or identity as a heterosexual; (3) breach of contract or implied contract against the Board of Trustees because Heike's athletic scholarship was not renewed for the two additional years that it would take her to complete her college education; (4) defamation by all Defendants based on allegedly false statements that were made by individuals during the process of deciding not to renew Heike's athletic scholarship that allegedly prevented Heike from having her scholarship reinstated or receiving a scholarship from another school; (5) tortious interference with a contract or

-14-

advantageous business relationship or expectancy against Coach Guevara, Heeke, and Pickler for allegedly interfering with Heike's relationship with CMU; (6) intentional infliction of emotional distress by all Defendants; (7) violations of certain provisions of the Michigan Elliot-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §§ 37.2101, et seq., by all Defendants based on allegations of discrimination because of Heike's "race and color," and "heterosexual preference"; (8) negligent hiring of Coach Guevara against the Board of Trustees and AD Heeke based on the alleged lack of research into Coach Guevara's background; and (9) negligent supervision of Coach Guevara against the Board of Trustees and AD Heeke based on Coach Guevara's conduct towards Heike.

On September 2, 2009, the Court granted in part Defendants' motion to dismiss [09-10427 Dkt. # 30]. The Court dismissed all of Heike's claims against the Board of Trustees, a public university that is an arm of the State of Michigan, on the basis of sovereign immunity and because the Board of Trustees is not a "person" for the purposes of § 1983. As noted above, Heike's claims against the Board of Trustees had included equal protection violations, due process violations, breach of contract, ELCRA violations, negligent hiring, and negligent supervision. The Court also dismissed all of Heike's claims against Coach Guevara, AD Heeke, and Pickler in their official capacities on the basis of sovereign immunity to the extent that the claims sought monetary damages or retrospective relief. Heike's federal claims against Coach Guevara, AD Heeke, and Pickler were not barred by sovereign immunity to the extent that she sought prospective injunctive relief. Even though lawsuits for monetary damages or retrospective relief against state officials acting in their official capacity are suits against the state and are thus barred in federal court by the Eleventh Amendment, *Edelman v. Jordan*, 415 U.S. 651, 663 (1974), a state official sued in his or her official

capacity for prospective equitable relief "is generally not regarded as 'the state' for purposes of the Eleventh Amendment and the case may proceed in federal court." *MacDonald v. Vill. of Northport Mich.*, 164 F.3d 964, 970 (6th Cir. 1999). The Court directed the parties to submit supplemental briefing as to Heike's negligent hiring and supervision claims against AD Heeke, and Heike's defamation claims against Coach Guevara, AD Heeke, and Pickler.

After the parties filed supplemental briefing, the Court granted in part and denied in part the remainder of Defendants' motion to dismiss on November 6, 2009. [09-10427 Dkt. # 34]. The Court dismissed Heike's claims of negligent hiring and negligent supervision against AD Heeke and Heike's defamation claims against AD Heeke and Pickler. The Court rejected Coach Guevara's arguments that Coach Guevara's alleged defamatory statements are absolutely privileged or non-actionable statements of opinion. Nonetheless, the Court concluded that Heike had not sufficiently pleaded special damages to support her defamation claim against Coach Guevara, and granted Heike leave to amend the complaint. On November 13, 2009, Heike filed an amended complaint and on February 9, 2010, the Court granted Coach Guevara's motion to dismiss Heike's defamation claim, primarily because Heike consented to Coach Guevara's expression of her evaluation when Heike requested an appeals committee hearing. [09-10427 Dkt. # 59].

Finally, on May 3, 2010, the Court granted Defendants' motion for summary judgment [09-10427 Dkt. #77] as to Heike's remaining federal claims based on violations of procedural and substantive due process and equal protection pursuant to § 1983 against Defendants in their individual capacities and in their official capacities for injunctive relief. More specifically, the Court found that as to Heike's race-based equal protection claims, she had not demonstrated that others who were similarly situated but not members of the protected class were treated more favorably or

that Defendants' legitimate non-discriminatory reasons for not renewing Heike's scholarship were pretext. The Court granted summary judgment on Heike's sexual preference equal protection claims because there was not enough to "demonstrat[e] that the challenged government action was motivated by animus or ill-will." Heike's substantive due process claim was summarily dismissed because there was no suggestion that, at the time she was awarded her scholarship, there was a presumption of automatic renewal in order to demonstrate a protected property interest. Finally, the Court dismissed Heike's procedural due process claims because, even assuming a constitutionally protected property interest, Heike had not raised genuine issues of material facts as to whether she had an opportunity to be heard on Coach Guevara's decision not to renew her scholarship. Moreover, Heike had not advanced evidence to suggest that the outcome of the appeals hearing was predetermined or that she did not have a fair opportunity to present her side of the story. The Court declined to exercise jurisdiction over Heike's remaining state law claims for tortious interference with a contract or advantageous business relationship or expectancy, intentional infliction of emotional distress, and violations of certain provisions of the Michigan ELCRA.

## II.   Standard of Review

"A Rule 12(c) motion for judgment on the pleadings for failure to state a claim upon which relief can be granted is nearly identical to that employed under a Rule 12(b)(6) motion to dismiss." *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006) (citations omitted). When a court is presented with a Rule 12(b)(6) or 12(c) motion, "it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss, so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir.

2008); *see also Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999) (stating that "[t]here are exceptions to th[e] general rule" that "matters outside the pleadings may not be considered in ruling on a 12(b)(6) motion to dismiss" and that "[c]ourts may . . . consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies."). A court "must construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and draw all reasonable inferences in favor of the plaintiff." 528 F.3d at 430. (citation and internal quotations omitted). Yet, to survive such a motion, a plaintiff's complaint "must contain either direct or inferential allegations respecting all the material elements [of the claim] to sustain a recovery under some viable legal theory." *First Am. Title Co. v. Devaugh*, 480 F.3d 438, 444 (6th Cir. 2007) (internal quotation omitted). "Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). *See also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Twombly v. Bell*, 550 U.S. 544, 555 (2007) (explaining that a complaint must contain something more than a statement of facts that merely creates speculation or suspicion of a legally cognizable cause of action). A Rule 12(c) motion "is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991).

### III.   Analysis

#### A.   Claim Preclusion

Res judicata, i.e., the preclusive effect of a judgment, encompasses two distinct doctrines: claim preclusion and issue preclusion. *Taylor v. Sturgell*, 553 U.S. 880, 891-93 (2008). Claim preclusion "forecloses 'successive litigation of the very same claim, whether or not relitigation of

the claim raises the same issues as the earlier suit.' " *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)); *see also Dodrill v. Ludt*, 764 F.2d 442, 443 (6th Cir. 1985).  When a previous judgment upon which the defendant bases a res judicata argument was issued by a federal court on a federal question, it is necessary to look to federal law to determine the judgment's preclusive effect. *Hamilton's Bogarts, Inc., v. Michigan*, 501 F.3d 644, 650 (6th Cir. 2007). "Res judicata applies when (1) there is a final decision on the merits of the first action by a court of competent jurisdiction; (2) the second action involves the same parties, or their privies, as the first; (3) the second action raises an issue actually litigated or which should have been litigated in the first action; and (4) there is identity of claims." *Walker v. General Tel. Co.*, 25 F. App'x 332, 336 (6th Cir. 2001); *see Sanders Confectionery Prod., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 480 (6th Cir.1992).

Defendants contend that Heike's claims against them are barred by res judicata because all four elements are met: the Court's order in *Heike I* granting in part and denying in part Defendants' motion to dismiss and the Court's order granting Defendants' motion for summary judgment were an adjudication on the merits of the claims which involved the same parties or their privities, the resolved issues were actually litigated or should have been litigated, and the instant complaint is nearly identical to the complaint in *Heike I.*

### 1.    Final Decision on the Merits

Defendants emphasize that the Court made not only one, but two final decisions on the merits in the first action. More specifically, the Court's May 3, 2010 order granting Defendants' motion for summary judgment, which dismissed the remaining official-capacity and individual-capacity claims against Defendants' privities with prejudice (i.e., AD Heeke, Coach Guevara, and Pickler), was a final decision on the merits. [09-10427 Dkt. #78]. The § 1983 claims against the individual

Defendants in their official capacity survived Defendants' motion to dismiss in *Heike I* to the extent Heike sought prospective relief. In regard to such claims, the Court recognized the officials were "persons" within the meaning of § 1983, and they were not entitled to Eleventh Amendment immunity. *See Heike*, 654 F. Supp. 2d 658, 668-72 (E.D. Mich. 2009). Defendants' contend that the official-capacity claims under § 1983 merely represented another way for Heike to plead her discrimination action against the Board of Trustees and, accordingly the Court permitted her to proceed . *See Graham, Kentucky v. Graham*, 473 U.S. 159, 165 (1985). An order granting summary judgment under Federal Rule of Civil Procedure 56 is a "final decision on the merits" for purposes of res judicata. *Nathan v. Rowan*, 651 F.2d 1223, 1226 (6th Cir. 1981). In short, Defendants contend that because there was a later final decision on the merits in *Heike I* in regard to the Board of Trustees and its privities when summary judgment of the official-capacity claims was granted, no further analysis in this regard is necessary.

Defendants also note that the September 2, 2009 order dismissing the Board of Trustees was a separate final decision on the merits for purposes of res judicata. In moving for the dismissal of the Board of Trustees in *Heike I*, Defendants argued that the Board of Trustees, as an "arm of the state," was not a "person" within the meaning of 42 U.S.C. § 1983, and that the claims against the Board of Trustees should be dismissed pursuant to Rule 12(b)(6) for Heike's failure to state a claim upon which relief can be granted. The Court agreed. *See Heike*, 654 F. Supp. 2d at 672. Typically, a dismissal for failure to state a claim is a decision on the merits. *See Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 917 (6th Cir. 1986). Thus, the September 2, 2009 Order was also a final decision on the merits for purposes of res judicata.

Furthermore, Defendants emphasize that it is immaterial that the September 2, 2009 order

granting in part and denying in part Defendants' motion to dismiss concluded that the claims against the Board of Trustees were barred by the Eleventh Amendment and should be dismissed on the basis of sovereign immunity. Under the Federal Rules of Civil Procedure, involuntary dismissal based on "lack of jurisdiction" is not an adjudication on the merits. *See* Fed R. Civ. P.41(b).  While some courts have concluded that Eleventh Amendment immunity divests federal courts of "subject-matter jurisdiction," the Sixth Circuit has noted significant differences between a defense based on lack of subject matter jurisdiction and a defense based on sovereign immunity, *see Nair v. Oakland County Community Mental Health Authority*, 443 F.3d 469, 474 (6th Cir. 2006) (holding that a defense based on Eleventh Amendment immunity "is not coextensive with the limitations on judicial power in Article III"), and other courts have concluded that a prior dismissal based on Eleventh Amendment immunity may have res judicata effect on a subsequent lawsuit, *see Adams v. Bosco*, No. 98-CV-8737(RO), 1999 WL 165691, at *1, n.1 (S.D.N.Y. March 25, 1999) (recognizing that "the case law has some divergence on whether a dismissal for sovereign immunity under the Eleventh Amendment constitutes a final judgment on the merits" and that "there is some support for the proposition that '[a] dismissal based on sovereign immunity is a decision on the merits, as it determines that a party has no cause of action or substantive right to recover.' ") (citing *Bloomquist v. Brady*, 894 F. Supp. 108, 116 (W.D.N.Y. 1995); *see also Cox v. Mississippi Dept. of Corrections*, No. 4:06CV102-SA-EMB, 2008 WL 2563356 (D. Miss. June 26, 2008).

Moreover, Defendants note that–whether or not the portion of the Court's September 2, 2009 order dismissing the Board of Trustees on sovereign immunity grounds is a final decision on the merits–the Court's conclusion that Heike did not state a claim against the Board of Trustees because the Board of Trustees was not a "person" within the meaning of § 1983 is a final decision on the

merits. The Sixth Circuit has held that federal courts have discretion to address the sovereign immunity defense and the merits of a case in whichever order they prefer. *Nair*, 443 F.3d at 477. Consequently, this Court properly reached the merits of Heike's § 1983 claims against the Board of Trustees in resolving Defendants' motion to dismiss in *Heike I*.

In *Nair*, the plaintiff, a medical director at a county health organization, brought § 1983 claims and whistleblower claims against the organization after his employment was terminated. 443 F.3d at 472-73. The trial court granted summary judgment to the organization on the merits, notwithstanding the organization's argument that Eleventh Amendment sovereign immunity barred the suit. *Id.* at 473. In affirming the decision, the Sixth Circuit recognized that claims barred by the Eleventh Amendment were not the same as claims barred by lack of subject matter jurisdiction:

> "[w]hile the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power," the defense "is not coextensive with the limitations on judicial power in Article III." Unlike subject-matter jurisdiction, a State may waive Eleventh Amendment immunity through its own conduct: by legislation, by removing an action to federal court, or by "appearing without objection and defending on the merits" . . . . . Unlike subject matter jurisdiction, federal courts have no obligation to raise an Eleventh Amendment issue on their own, even though they may do so if they wish. And unlike subject-matter jurisdiction "the entity asserting Eleventh Amendment Immunity has the burden to show that it is entitled to immunity."

*Id.* at 474 (citations omitted). Because of these differences, the Court held that, unlike claims over which a trial court has no subject matter jurisdiction, when the state defendant raises the Eleventh Amendment defense as an alternative argument, the trial court may resolve the merits of the underlying action before reaching issues regarding sovereign immunity. *Id.* at 474-77. In relevant part, the Court held:

> Under these circumstances and under any circumstances in which the State (or the United States) declines to raise sovereign immunity as a threshold defense, we conclude that the federal courts have discretion to address the sovereign-immunity

defense and the merits in whichever order they prefer. To our knowledge, no court of appeals to consider this question has held to the contrary, and several have explicitly or implicitly embraced this approach.

*Id.* at 477 (citations omitted).

Defendants emphasize that the Board of Trustees presented both the sovereign immunity defense and the argument that the Board of Trustees was not a "person" as two separate and independent grounds for dismissing Plaintiffs claims in *Heike I*. [09-10427 Dkt. #24]. Heike addressed each argument in her papers and the Court stated that:

> whether [the] CMU [Board of Trustees] or the individual Defendants in their official capacities are "persons" within the meaning of § 1983 *is a separate issue* from whether Defendants have waived their sovereign immunity. Even if sovereign immunity had been waived, [the] CMU [Board of Trustees] and the individual Defendants in their official capacities would not be amenable to a suit for monetary damages under § 1983 because they are not "persons" within the meaning of the statute.
>
> Thus, even if Plaintiff's federal and state law claims against the individual Defendants in their official capacities and [the] CMU [Board of Trustees] could not be dismissed on the basis of sovereign immunity, the claims could be dismissed based on the fact that the Defendants are not "persons" within the meaning of § 1983, except to the extent that Plaintiff's federal claims seek prospective injunctive relief.

*Heike*, 654 F. Supp. 2d at 672 (emphasis added).

Heike, however, contends that the Court's prior orders in *Heike I* do not serve as final decisions on the merits of the claims against the Board of Trustees. Heike argues that the Court's determination that the Board of Trustees could not be a "person" under § 1983 is not an adjudication on the merits but is instead simply the recognition that the Board of Trustees is entitled to sovereign immunity. According to Heike, the doctrine of sovereign immunity merely removes subject matter jurisdiction in lawsuits against the government, unless the government consents to the suit. *Beamon v. Brown*, 125 F.3d 965, 967 (6th Cir. 1997); *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320,

-23-

1325 (6th Cir. 1993) (citing *United States v. Mitchell*, 463 U.S. 206, 212 (1983)). Heike contends that sovereign immunity must be addressed before a court addresses the merits of any claims. *See, e.g.*, *Angel v. Kentucky*, 314 F.3d 262, 265 (6th Cir. 2002) ("We must therefore address the jurisdictional [Eleventh Amendment] question that clearly exists, even though it was not addressed by the court below."); *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Engler*, 304 F.3d 616, 618 (6th Cir. 2002) ("jurisdictional issues," including an Eleventh Amendment defense, must "be addressed prior to reaching the merits"); *Rossborough Mfg. Co. v. Trimble*, 301 F.3d 482, 489 (6th Cir. 2002) ("As a threshold matter, we must determine whether the Treasurer and the Administrator are entitled to Eleventh Amendment immunity."); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 570 (6th Cir. 2000) ("We first address Defendants' Eleventh Amendment immunity defense because this defense raises a question of federal jurisdiction."); *Wells v. Brown*, 891 F.2d 591, 592-93 (6th Cir. 1989) ("We are required to decide [the Eleventh Amendment] issue before we decide the merits").

Moreover, Heike argues that when a court dismisses a claim for lack of subject matter jurisdiction, res judicata does not act as a bar to a subsequent claim based on the same alleged wrongs. *Holloway v. Brush*, 220 F.3d 767, 778 (6th Cir. 2000) ("The basic rule that dismissal for lack of subject matter jurisdiction does not preclude a second action on the same claim is well settled"). Thus, the Court decided in *Heike I* that, based on sovereign immunity, the Court lacked subject matter jurisdiction over the Board of Trustees which cannot now preclude a different action against the same defendant for which the Court does have subject matter jurisdiction. Heike also asserts that because Title VI and Title IX cases can only be brought against institutions and not individuals, whether or not the Board of Trustees was a "person" capable of being sued under § 1983

-24-

cannot be determinative of Heike's claims under Title VI and Title IX. Because there was no decision on the merits of the claims against the Board of Trustees that Heike brings in the instant action, Heike contends that Defendants have not established an essential element of res judicata.

Defendants reply that Heike is incorrect in contending that the Court's September 2, 2009, finding the Board of Trustees not subject to suit under § 1983 "is a recognition that, because of sovereign immunity, a state is not a person capable of being sued under Section 1983." (Pl.'s Resp. to Def.s' Mot. to Dismiss at 11.) In coming to this conclusion, Defendants emphasize that Heike ignores that the Court held in *Heike I* that dismissal of the Board of Trustees was appropriate under Rule 12(b)(6) both because of sovereign immunity and because the Board of Trustees is not a person within the meaning of § 1983. Heike does not address the latter portion of this holding. Defendants also highlight that Heike does not recognize the Court's May 3, 2010 order granting summary judgment as a final adjudication on the merits, which dismissed her remaining claims against the individual defendants in their official capacities.

The appellate court made clear in *Nair* that the jurisdictional component of sovereign immunity is not equivalent to subject-matter jurisdiction in that a Court cannot raise the issue of sovereign immunity *sua sponte* but is instead a defense available for which the entity asserting the immunity has the burden of proof. Indeed, the only utility of categorizing sovereign immunity as "jurisdictional" appears to be to preserve the rule that it may be raised at any time. *See, e.g.*, *State Highway Commission of Missouri v. Volpe*, 479 F.2d 1009 (8th Cir. 1973); *Michigan Head Start Directors Ass'n v. Butz*, 397 F. Supp. 1124, 1134 (W.D. Mich. 1975). Instead, sovereign immunity is better characterized as a bar to the issuance of a remedy to a plaintiff.

Aside from dismissing the Board of Trustee based on sovereign immunity, the Court also

-25-

explicitly stated that the claims were being separately dismissed because the Board of Trustees was not a "person" for the purposes of § 1983. The claims against the individual defendants in their official capacities were similarly dismissed on the merits. As will be discussed below, the individual defendants in their official capacities are privities of Defendants in the instant case. Because the Court's adjudication of the claims against the defendants in *Heike I* was based on Rule 12(b)(6) and Rule 56, as well as the Board of Trustee's sovereign immunity, the Court's prior orders serve as a "final adjudication on the merits" for the purposes of res judicata.

### 2.    Same Parties or Their Privities

Defendants also contend that the second element of res judicata is met in this case. It is undisputed that the plaintiff at issue in this motion, Heike, is the same individual who brought the previous action. Furthermore, the Board of Trustees was named as a defendant in *Heike I*.

Defendants believe that Heike purposefully identified CMU as a separate defendant, jointly and severally with the Board of Trustees, in the present lawsuit. Defendants contend this was done to avoid dismissal of the present action for including the same parties as the previous action. However, under Michigan law the Board of Trustees of the University *is* the University. Mich. Comp. Laws § 390.551 and Mich. Const. 1963, art. 8 sec. 6 state that CMU shall be governed by a "board of control," whose members are appointed by the Governor. Further, § 390.555 defines the board as a body politic and corporate, and gives the board the authority to "sue and be sued." *See also Paquin v. Northern Michigan University*, 79 Mich. App. 605, 608-610 (1977). As a result, any claim against the Board of Trustees is, in effect, a suit against CMU itself. Defendants contend that Heike cannot avoid the application of res judicata simply by naming "Central Michigan University" as if it were a separate legal entity capable of being sued. Furthermore, even if CMU were a separate

-26-

legal entity capable of being sued, Defendants argue it would clearly be in privity with the Board of Trustees.

In addition, the Board of Trustees is in privity with its officials, Dave Heeke, Sue Guevara, and Patricia Pickler, who were all sued in their "official capacities" in the previous case. [09-10427 Dkt. #1 ¶¶ 6-8]. More specifically, Coach Guevara was sued in her official capacity as head coach of the women's basketball program, AD Heeke was sued in his official capacity as the chief administrator and executive of the Athletics Department, and Pickler was sued in her official capacity as Assistant Director of the Office of Scholarships and Financial Aid. Heike's complaint in *Heike I* alleged that the individual defendants, by virtue of their positions, were policy-making and decision-making officials for the Board of Trustees. [09-10427 Dkt. #1 ¶¶ 6-8].

"A government official sued in his or her official capacity is considered to be in privity with the government," such that "a judgment for or against an official will preclude a subsequent action on the same claim by or against . . . [an] agency of the same government." *Crawford v. Charbot*, 202 F.R.D. 223, 227 (W.D. Mich. 1998) (quoting Moore's Federal Practice 3d § 131.40[3][e][ii]); *see also Pittman v. Michigan Corrs. Org.*, 123 F. App'x 637, 640 (6th Cir. 2005). Furthermore, official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Defendants argue that because both actions involve the same parties and/or the privities of the Board of Trustees, this element for res judicata is satisfied.

Heike responds that the pending action does not involve the same parties or privities as the prior action. First, Heike contends that the individual defendants in *Heike I* who were sued in their official capacities are the privities of the Board of Trustees but the individual defendants, in their

individual capacities, are not the privities of the Board of Trustees. The Sixth Circuit has held that

> [T]he rule of differing capacities provides that "[a] party appearing in an action in
> one capacity, individual or representative, is not thereby bound by or entitled to the
> benefits of the rules of res judicata in a subsequent action in which he appears in
> another capacity." Restatement Second of Judgments § 36(2) (1982). The rule of
> differing capacities generally operates to allow a subsequent individual capacity suit
> against a governmental official even where a prior suit alleged an official capacity
> claim against the same official. *See Wilkins [v. Jakeway]*, 183 F.3d at 534-35
> (recognizing the distinction between individual and official capacity claims and
> applying the rule of differing capacities-albeit without explicitly referring to the
> rule); see also *Warnock v. Pecos County*, 116 F.3d 776 (5th Cir.1997) (holding that
> a prior suit against a municipality does not bar a later suit against local officials in
> their individual capacity); *Conner v. Reinhard*, 847 F.2d 384, 395 (7th Cir.) (holding
> that a prior suit against a municipality does not bar a subsequent suit against officials
> individually because official capacity and personal capacity suits involve different
> legal theories and defenses), cert. denied, 488 U.S. 856, 109 S. Ct. 147, 102 L.Ed.2d
> 118 (1988); *Headley v. Bacon*, 828 F.2d 1272, 1277-79 (8th Cir.1987)
> (distinguishing privity between principal and agent from privity between a
> governmental entity and officials sued in their individual capacities). See also
> Howell *Hydrocarbons, Inc. v. Adams*, 897 F.2d 183, 188 (5th Cir.1990) ("Res
> judicata does not apply when the parties appear in one action in a representative
> capacity and in a subsequent action in an individual capacity.").

*Mitchell v. Chapman*, 343 F.3d 811, 823 (6th Cir. 2003). Heike argues that because the individual

defendants in *Heike I* were also sued in their individual capacities they cannot stand as privities for

the Board of Trustees. Heike further contends that the Court's decision dismissing the Board of

Trustees based on sovereign immunity resulted in the suit being maintained against the individual

defendants solely in their individual capacities.

Heike's response, however, ignores the fact that the Board of Trustees was a defendant to

the prior suit. Heike also does not acknowledge that the individual defendants were also sued in

their official capacities and not solely in their individual capacities. The rule of "differing capacities"

does not apply to the instant case. Heike is not seeking to pursue a second lawsuit against individual

defendants in one capacity after first pursuing claims against them in a different capacity. As a

result, the individual defendants in *Heike I* who were sued in their official capacity at CMU are

in privity with CMU and the Board of Trustees. Because "a judgment for or against an official will

preclude a subsequent action on the same claim by or against . . . [an] agency of the same

government," *Crawford*, 202 F.R.D. at 227; *see also Pittman*, 123 F. App'x at 640, and because the

instant case alleges claims against parties or their privities that are present in both suits, this element

of res judicata is satisfied.

### 3. Issues Actually Litigated or Issues that Should Have Been Litigated

Lastly, Defendants contend that the third and fourth elements of res judicata have been met

in this case, and discuss the elements together. For the sake of clarity, the elements have been

separated in this opinion. The third element recognizes that having failed to recover on one theory,

a litigant cannot attempt to relitigate the same claim under a different theory of recovery. *Poe v.

John Deere Co.*, 695 F.2d 1103, 1105 (8th Cir. 1982); *see also* Restatement (Second) of Judgments

§ 25 (providing that res judicata applies "even though the plaintiff is prepared in the second action

. . . [t]o present evidence or grounds or theories of the case not presented in the first action, or . . .

[t]o seek remedies . . . not demanded in the first action."). In other words, the third element of res

judicata is met when the second action raises an issue which "should have been litigated" in the first

action. *Walker*, 25 F. App'x at 336.

To determine whether a claim "should have been litigated" in an earlier action, the Sixth

Circuit has stated that "[w]here the two causes of action arise from the 'same transaction, or series

of transactions,' a plaintiff should have litigated both causes in the first action and may not litigate

the second issue later." *Holder v. City of Cleveland*, 287 F. App'x 468, 471 (6th Cir. 2008) (citing

*Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 529 (6th Cir. 2006). In *Holder*, the plaintiff, a city

-29-

employee, brought an action against the city under the Federal Equal Pay Act, and summary judgment was granted in favor of the city. The employee then brought a second action against the city alleging race and gender discrimination under Title VII and 42 U.S.C. § 1981. *Id.* at 469-70. In affirming dismissal of the second action on grounds of res judicata, the Sixth Circuit held that both suits arose from the same facts–disparate pay–and that it was only the legal theory of the plaintiff's claims that differed. *Id.* at 471 (recognizing that both claims involved the same employment, the same supervisor, and the same circumstances). While the plaintiff argued that she did not have her Equal Employment Opportunity Commission right-to-sue letter at the time she initially filed the first suit, the Court concluded that res judicata nonetheless barred the subsequent action because the plaintiff "sat on her rights" when she failed to later amend her complaint to add her race discrimination claims. *Id.*

Defendants contend that Heike similarly should have raised Title VI and Title IX claims against the Board of Trustees in the first action if she thought they were viable causes of action. Instead, Heike "sat on her rights." Heike's Title VI and Title IX claims involve the same set of circumstances surrounding Heike's experience on CMU's women's basketball team, over the same period of time during the 2007-08 season, and against the same or similar defendants, with only Heike's legal theories changing. Defendants emphasize that Heike's alleged Title VI and Title IX claims would have arisen before the first action was filed, and could have been brought before the Court at any time. Heike also stated in a supplemental brief in *Heike I* that she intended to seek leave to amend her complaint to assert a claim under Title IX, but never did so. Additionally, Defendants assert that Heike's Title VI claim is indistinguishable from her § 1983 claim against CMU alleging violations of the Equal Protection Clause of the Fourteenth Amendment based on

-30-

race. According to Defendants, Heike's voluntarily choosing not to amend her complaint in *Heike I* to add these claims illustrates that she should have asserted the claims in the first action.

In other words, Heike chose to assert various claims against the Board of Trustees and its officials in their official capacity, including discrimination claims under 42 U.S.C. § 1983, and sought both monetary damages and prospective relief in *Heike I*. Heike chose not to assert her Title VI and Title IX claims against CMU even though those claims were based on the "same transaction, or series of transactions." Heike's § 1983 claims against the Board of Trustees were then dismissed, at least in part, because she failed to state a claim. At that point, Heike was aware that her discrimination claims against the Board of Trustees could not be asserted under § 1983 to the extent she sought monetary relief. However, rather than amend her complaint to add the Title VI and Title IX claims, Heike chose to continue to litigate her discrimination claims against CMU by proceeding against its employees in their official capacities. As Defendants previously stated, official-capacity suits merely represent "another way of pleading an action against an entity of which an officer is an agent." *Graham*, 473 U.S. at 165. Defendants believe that it was only after it began to appear that this Court was on the cusp of granting summary judgment of the official capacity claims that Heike began to rethink this strategy and the instant case presents a text-book example of when res judicata should apply.

Heike responds that she could not have brought the instant claims in *Heike I*, because at the time she could have raised these claims, the Board of Trustees was no longer a party to the *Heike I* lawsuit. Heike contends that addition of the claims would not have been a simple matter of amending the complaint. Instead, additional claims would have to have been added by Heike and a new plaintiff, Brown, against a defendant who was no longer a party to the lawsuit. The Title VI

and Title IX claims could not have been asserted against the individual defendants who were the only defendants to the *Heike I* lawsuit after the Board of Trustees was dismissed based on sovereign immunity. Such a pleading is not an "amendment" of an existing complaint; it is a completely different lawsuit according to Heike, so she proceeded to file a different lawsuit while the *Heike I* suit was pending against the individual defendants for claims under § 1983 and state law. Although Heike indicated in a supplemental pleading in the *Heike I* case that she intended to amend her complaint to add these claims, Heike believed there was no basis for an amendment upon further investigation.  This necessitated the filing of a separate action.

Heike asserts that if she had sought to amend the complaint to add her Title VI and Title IX claims against the Board of Trustees, the individual defendants would have opposed such an amendment as unnecessarily complicating the suit, and insisted that Heike bring those claims against the Board of Trustees in a separate action. Furthermore, Heike emphasizes that only claims under § 1983 against the individuals in their "official capacities" for prospective injunctive relief survived dismissal in accordance with *Ex Parte Young*.  Heike does not explain how being precluded from pursuing a monetary remedy against the individual defendants in their official capacity is legally significant to the analysis.

Heike contends that Defendants' speculation as to why she filed a second lawsuit is untrue. Heike beleives that a motion for leave to amend the complaint in *Heike I* to assert the claims brought in the instant action would most likely have been denied by the Court because of her delay in including the additional legal theories in the case. As a result, Heike requests that the Court deny Defendants' motion for judgment on the pleadings because they have not established this element in order to invoke res judicata.

Defendants argue in their reply that the prior adjudication still acts as a bar even though Heike is seeking monetary relief in this case. Res judicata extinguishes a claim by the plaintiff against the defendant even though the plaintiff is seeking remedies or forms of relief not demanded in the first action. *See Huck on Behalf of Sea Air Shuttle Corp. v. Dawson*, 106 F.3d 45, 49-50 (3rd Cir. 1997) (quoting Restatement (Second) of Judgments, § 25). In *Huck*, the Court rejected the argument that res judicata did not apply because the plaintiff sought monetary damages in the subsequent litigation in contrast to the injunctive relief that he sought in the prior action. *Id.* (stating that such an argument was "without merit" and "contrary to the law").

Furthermore, Defendants disagree with Heike's argument that she could not have asserted the Title VI and Title IX claims in *Heike I* because at the time she could have raised those claims the Board of Trustees was no longer a party. Defendants emphasize that there was nothing preventing Heike from asserting her Title VI and Title IX claims in her *original* complaint because the claims are based on the same facts as her § 1983 claims. Heike's Title VI and Title IX claims clearly accrued before she filed her original complaint in *Heike I*, and whether Heike could have successfully amended her complaint is irrelevant.

Heike could have unquestionably made all of the same allegations and claims she makes in the current lawsuit in the earlier lawsuit. That Heike elected to wait until after the Board of Trustees was dismissed based on sovereign immunity is inapposite. Here, the two causes of action arise from the "same transaction, or series of transactions," and Heike should have litigated both causes in the first action. *Holder*, 287 F. App'x at 471 (6th Cir. 2008). There is nothing before the Court to suggest that Heike was somehow precluded from asserting her Title VI and Title IX claims, and Heike herself makes this very clear by pleading nearly identical facts to those contained in the *Heike*

*I* complaint. Heike cannot now litigate new legal theories predicated on the same facts as those in the first lawsuit. Accordingly, the third element of res judicata has been satisfied.

### 4.   Identity of Claims

For the fourth element to be satisfied, "there must be an identity of the causes of action that is, an identity of the facts creating the right of action and of the evidence necessary to sustain each action." *Westwood Chemical Co. v. Kulick*, 656 F.2d 1224, 1227 (6th Cir. 1981). A cursory review of the complaint filed in *Heike I* shows that it involves nearly identical allegations as those asserted in the instant complaint and the operative facts in the instant complaint mirror those from the complaint in *Heike I*.  In particular, Defendants note that paragraphs 4, 5, 9-25, 28-30, 32, 34-35, 37-38, 41-43, 45-54, 56-57, 59, 61-95, 98-100, 101-107, 108-111, 112, and 120-121 from the complaint in *Heike I* are either identical or virtually identical to paragraphs 4, 6, 9-25, 41-43, 44, 47-48, 50-51, 55-57, 64-73,83-84,88, 104-138, 140-142, 145-151, 153-156, 158, and 176-177, respectively, from the complaint in the present action. Defendants argue that there is plainly an "identity of claims," and all four elements of res judicata have thus been met.  As a result, Defendants request that Heike's claims against the Board of Trustees and CMU be dismissed.

Heike submits that in order to have an identity of claims, there must be an identity of the evidence necessary to sustain each action and not just an identity of facts. In the immediate case, Heike asserts claims under Title VI and Title IX which involve different burdens of proof and proffers of evidence than the claims in *Heike I.* Heike does not provide any legal authority for this contention. Defendants assert in their reply that Heike cannot avoid the preclusive effects of res judicata by couching her current claims under legal theories with different elements where the facts underlying the claims are identical. *See* Restatement (Second) of Judgments § 25.

-34-

"Identity of claims" does not require there to be identical elements under the law or that the evidence required to prove the claims at issue be identical. Instead, identity of claims mean "an identity of the facts and events creating the right of action and of the evidence necessary to sustain each action." *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 484 (6th Cir.1992); *see also Browning v. Levy*, 283 F.3d 761, 773-74 (6th Cir. 2002) (finding that an identity of claims is satisfied if the claims arose out of the same transaction or series of transactions, or if the claims arose out of the same core of operative facts). Here, both actions concern Heike's non-renewal of her scholarship and dismissal from the women's basketball team. Both actions are based on the same core set of facts. There are no new material facts in the instant complaint. Instead, Heike simply seeks to argue a different theory for recovery. Because the claims in the instant case arose out of the same transactions or series of transactions, which is evidenced by Heike including identical factual allegations in both complaints, the fourth requirement of identity of claims is satisfied in order to invoke the doctrine of res judicata. Accordingly, Defendants' motion for judgment on the pleadings will be granted and Heike's claims will be dismissed from the instant suit.

### B.   Collateral Estoppel

Collateral estoppel, or issue preclusion, "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Id.* (quoting *New Hampshire*, 532 U.S. at 748-49). Issue preclusion bars relitigation of an issue when: (1) the identical issue was raised and actually litigated in a prior proceeding; (2) the determination of the issue was necessary to the outcome of the prior proceeding; (3) the prior proceeding resulted in a final judgment on the merits;

and (4) the party against whom issue preclusion is sought had a full and fair opportunity to litigate the issue in the prior proceeding. *Aircraft Braking Sys. Corp. v. Local 856, Int'l Union, United Auto., Aerospace and Agric. Implement Workers, UAW*, 97 F.3d 155, 161 (6th Cir. 1996). Defendants argue that Heike's claims are barred by collateral estoppel in addition to res judicata, which will be discussed below.

More specifically, Defendants contend that the Court's May 3, 2010 order granting summary judgment to the individual defendants in *Heike I* resolved, among other things, all remaining issues related to Heike's § 1983 Equal Protection claims. In the order, the Court determined that there was no genuine issue of material fact that any of the individual Defendants, in either their official and individual capacities, discriminated against Heike based on her race or sexual preference. That determination was necessary to resolving the motion for summary judgment, resulted in a final judgment on the merits, and afforded Heike a full and fair opportunity to litigate the exact same discrimination issue presented in the immediate case.

In other words, Defendants assert that the precise issue of whether Heike suffered any type of discrimination at CMU arising out of her experience on the women's basketball team, including the decision to not renew her scholarship, has already been litigated and thus collateral estoppel bars relitigation of these issues. *Chakan v. City of Detroit*, 998 F. Supp. 779, 783-84 (1998) (holding that collateral estoppel barred an employee from asserting claims for race discrimination under Title VII against his municipal employer in federal court, where a previous state court action found in favor of the employer on the employee's race claims under Michigan's Elliott-Larsen Civil Rights Act). Defendants request that Heike be dismissed as a party to the instant case as a result.

As an initial matter, Heike contends that there was no adjudication of any matter as to the

Board of Trustees because it was dismissed from *Heike I* based on a lack of subject matter jurisdiction. Because there was no litigation of any issues, there cannot now be "relitigation" of any matter as to the Board of Trustees. Furthermore, as Heike previously argued, because the individual defendants in their individual capacities are not privities of the Board of Trustees, and the instant case cannot be considered relitigating the same issues. Both of these arguments ignore the separate ruling that the Board of Trustees was not a "person" for purposes of suit under § 1983 and that the individual defendants were sued in their official, not solely individual, capacities.

Moreover, Heike contends that collateral estoppel is inapplicable because the precise issues raised in the instant case were not raised and actually litigated in *Heike I*. The elements of Heike's causes of action under Titles VI and IX against the university differ significantly from that of her claim that the individual defendants deprived her of her rights to due process and equal protection. Heike submits that a Title VI claim is more akin to a First Amendment retaliation claim or a disparate impact discrimination claim than it is to a claim alleging deprivation of Fourteenth Amendment rights brought under § 1983. Likewise, a Title IX case involves an allegation that a school–not an individual–failed to take corrective action or investigate claims or a deliberate indifference by the school to the actions of which a plaintiff complains. This, too, differs significantly from the claim that Heike brought in *Heike I* that the individual defendants deprived her of her Fourteenth Amendment rights by their actions. Thus, defendants cannot demonstrate that the precise issue raised in the case at bar was actually litigated in *Heike I*.

Dismissal based on collateral estoppel would be inappropriate in the instant case because the precise issue raised in the present case was not raised and actually litigated in *Heike I*. An issue for the purposes of collateral estoppel is

-37-

a single, certain and material point arising out of the allegations and contentions of
the parties. It may concern only the existence or nonexistence of certain facts, or it
may concern the legal significance of those facts. If the issues are merely evidentiary,
they need only deal with the same past events to be considered identical. However,
if they concern the legal significance of those facts, the legal standards to be applied
must also be identical; different legal standards as applied to the same set of facts
create different issues.

*Overseas Motors, Inc. v. Import Motors Ltd.*, 375 F. Supp. 499, 518 n.66a (E.D. Mich. 1974)

(emphasis added) (citations and internal quotation marks omitted), *aff'd* 519 F.2d 119 (6th Cir.

1975).  Heike's argument regarding identity of claims as it pertains to res judicata is helpful on this

point. To succeed on a Title VI claim, a plaintiff must prove that: (1) the plaintiff was engaged in

activity protected by Title VI; (2) this exercise of protected rights was known to the defendants; (3)

the defendants thereafter took a materially adverse action against the plaintiff; and (4) there was a

causal connection between the protected activity and the materially adverse action. Title VI requires

only that a plaintiff prove disparate impact in the application of federal funds. *Jennings v. Alexander*,

715 F.2d 1036, 1041 (6th Cir. 1983), *rev'd sub nom. Alexander v. Choate*, 469 U.S. 287 (1985).

The Sixth Circuit has stated that, for there to be liability under Title IX, a plaintiff must

establish that: (1) the sexual harassment was so severe, pervasive, and objectively offensive that it

could be said to deprive the plaintiff of access to the educational opportunities or benefits provided

by the funding recipient; (2) the funding recipient had actual knowledge of the sexual harassment;

and (3) the funding recipient was deliberately indifferent to the harassment. *Soper v. Hoben*, 195

F.3d 845, 854 (6th Cir. 1999). Under the Office for Civil Rights Title IX Guidelines, a school

"should take immediate and appropriate steps to investigate and otherwise determine what occurred

and take steps reasonably calculated to end any harassment, eliminate a hostile environment if one

has been created, and prevent harassment from occurring again." Sexual Harassment Guidance:

-38-

Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034, 12,042 (March 13, 1997).

Even where particular activities and particular defendants are subject to both Title IX and Equal Protection Clause claims, the standards for establishing liability are different. For example, a Title IX plaintiff can establish liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference. *Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274, 290 (1998). Yet a plaintiff stating a similar claim under § 1983 for violation of the Equal Protection Clause by a school or other governmental entity must show that the harassment was the result of governmental custom, policy, or practice. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009) (citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978)).

An Equal Protection claim requires a plaintiff to demonstrate that a defendant treated the plaintiff differently and adversely compared to those who are similarly-situated to the plaintiff, and that this disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis. *Club Italia Soccer & Sports Organization, Inc. v. Charter Tp. of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006). There is no such requirement for claims under either Title VI or Title IX. Likewise, under Title VI or Title IX, there is no requirement that the plaintiff establish animus or ill-will, or that the government action lacked a rational basis under a class-of-one theory pursuant to *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

The legal standards in the instant case are not identical to those applied in *Heike I*. The similarity of the claims as both seeking a remedy for sexual orientation, race, and gender discrimination is insufficient to bar Heike's claims based on collateral estoppel. Defendants have

thus not satisfied the first element for dismissal based on collateral estoppel because the precise issue in the present case was not raised and actually litigated in the prior proceeding.

### IV.   Conclusion

Accordingly, it is **ORDERED** that Defendants' motion to dismiss [Dkt. #18] is **CONSTRUED** as a motion for judgment on the pleadings.

It is further **ORDERED** that the hearing scheduled for May 11, 2011, is **CANCELED**.

It is further **ORDERED** that Defendants' motion for judgment on the pleadings [Dkt. #18] is **GRANTED**.

It is further **ORDERED** that Plaintiff Heike's claims are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that Plaintiffs' motion to stay proceedings [Dkt. #20] is **DENIED AS MOOT**.

                                        s/Thomas L. Ludington                          
                                        THOMAS L. LUDINGTON
                                        United States District Judge
Dated: July 1, 2011

<div style="border:1px solid">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 1, 2011.

                                        s/Michael Williams            
                                        Relief Case Manager

</div>